UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA :

-v.- : 12 Cr. 541 (JSR)

WESLEY WANG, : **REDACTED**

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S SUBMISSION**
**PURSUANT TO SECTION 5K1.1 OF THE GUIDELINES**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.

CHRISTOPHER LAVIGNE
JILLIAN BERMAN
Assistant United States Attorneys
- Of Counsel –



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 2, 2013

BY HAND AND REQUEST TO BE FILED UNDER SEAL

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

**Re: *United States* v. *Wesley Wang*,**
**12 Cr. 541 (JSR)**

Dear Judge Rakoff:

The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that defendant Wesley Wang has rendered in the investigation and prosecution of other persons. For the reasons outlined below, the Government moves, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

By way of background, on July 13, 2012, Wang pleaded guilty to Counts One and Two of the above-captioned Information. Count One of the Information charged Wang with conspiring with other individuals to commit securities fraud, in violation of Title 18 United States Code, Section 371, in connection with a scheme to engage in insider trading in the securities of various publicly held companies, from in or about 2005 through in or about January 2009. This charge carries a maximum sentence of five years' imprisonment, a maximum term of three years' supervised release, a maximum fine, pursuant to Title 18, United States Code § 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense, and a mandatory $100 special assessment.

Count Two of the Information charged Wang with a separate conspiracy. Specifically, Count Two charged Wang with conspiring with other individuals to commit securities fraud, in

violation of Title 18 United States Code, Section 371, in connection with a scheme to engage in insider trading in the securities of various publicly held companies, from in or about 2002 through in or about 2005. This charge carries a maximum sentence of five years' imprisonment, a maximum term of three years' supervised release, a maximum fine, pursuant to Title 18, United States Code § 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense, and a mandatory $100 special assessment.

Wang's guilty plea was made pursuant to a cooperation agreement with this Office. As part of the agreement, Wang agreed to waive any statute of limitations defense he may have as to Count 2 of the Information, which spanned up until 2005.

**I. Wang's Background**

Wang is a 39-year old former intern/research assistant/research analyst/consultant at various investment firms and hedge funds, including Whitman Capital, Sigma Capital, and most recently, Trellus Management. Wang is from Taiwan but immigrated to the United States around the age of ten with his family. He went to high school in California and began studying at Berkeley in approximately 1991. He has attended Berkeley off and on over the years and is about two courses away from earning a bachelors' degree. For many of the years in between, Wang worked in the investment world.

In the summer of 1998, Wang began an internship at Alex Brown, an investment bank. While Wang was working at Alex Brown, he met - and worked under - Karl Motey, another cooperating witness who will be sentenced by this Court on January 28, 2013. Wang had been working at Alex Brown for approximately six months when he was laid off. Thereafter, in 1999, Wang obtained a job at Whitman Capital as an intern. His title never officially changed, although Wang continued to work at Whitman Capital until 2002 on a part-time basis, where, among other things, he assisted with administrative tasks and in providing stock research.

In 2002, Wang left Whitman Capital to work at Sigma Capital ("Sigma"). Although Sigma and its affiliate SAC Capital (collectively "Sigma") were located in New York City/Connecticut, Wang worked for Sigma from Wang's home in Berkeley. Wang's title at Sigma was junior partner/analyst, and

his responsibilities included conducting research on companies in the semiconductor industry. Wang did not have final trading authority at Sigma, but provided information to his boss, Dipak Patel, who did have such authority. Wang earned an annual salary at Sigma of approximately $150,000. With bonus, his annual compensation between 2002 and 2005 ranged from approximately $150,000 to a little over $1 million.

Wang's father, who had lived in Taiwan, became ill in late 2004. Wang traveled to Taiwan to be with his ailing father, who passed away towards the end of 2004. Following his father's death, Wang did not return to work at Sigma. Wang was fired from Sigma in approximately the spring of 2005. Wang remained unemployed until later that year, when he began working as a consultant to Trellus Management ("Trellus"), a hedge fund with offices in New York. Like he did with Sigma, Wang carried out his consulting job at Trellus principally from his home in California. Wang served as a consultant to Trellus until approximately August or September 2008. He earned a salary of $150,000 per year, and a bonus that ranged up to approximately $1 million.

**II. Wang's Criminal Conduct**

Wang's criminal conduct regarding the instant offenses commenced around the time he obtained full-time employment with Sigma (in 2002, after his internship with Whitman Capital). Specifically, at Sigma, Wang obtained what he believed to be material, non-public information ("MNPI" or "Inside Innformation"), directly or indirectly, from insiders at various publicly-traded companies. Wang then passed along that MNPI to Dipak Patel, who made trading decisions for a portfolio at Sigma. In essence, in addition to conducting and performing legitimate market research at Sigma, Wang's role there included getting access to MNPI and providing it to Patel. [redacted] Wang did not personally trade on the Inside Information he obtained, but provided it to Patel with the understanding that it would be used in making trading decisions.

Wang received what he believed to be MNPI relating to various companies while at Sigma, including TSMC, Cisco, Broadcom, eBay, Cypress, and Cirrus Logic. The type of information Wang received from his contacts varied. For TSMC, for example, Wang

received "wafer data" from, among others, a contact outside the company who had a contact within TSMC. The wafer data was an indicator of how the semiconductor business was doing generally, and how certain of TSMC's customers were performing. Wang also received MNPI about Cisco's gross margin reporting; Wang obtained this from a contact who knew the Cisco insider who determined Cisco's gross margin number. Wang also received directional information about eBay, and information about revenue ranges for Broadcom from someone who had a contact in Broadcom's networking division.

[redacted]

When Wang began consulting for Trellus in 2005, he continued to traffic in Inside Information. Wang maintained some of the same contacts he utilized while at Sigma and developed new contacts. Like at Sigma, Wang obtained and provided MNPI to his bosses at Trellus, whom Wang believed valued this MNPI and traded on it. The information Wang provided included: [redacted] (2) information from an additional source (Leo Chocran) Wang developed at Cisco, about whom Wang testified at trial; (3) information about Polycom, which Wang learned from people including Doug Whitman (described in more detail below); and (4) information about Marvell, which Wang learned from people including Whitman (described in more detail below).

Like his time at Sigma, Wang did not personally trade on the MNPI he received, but passed it on to his bosses at Trellus who made trading decisions. In addition to trafficking in Inside Information at Trellus, however, Wang also conducted his own independent, legitimate research on publicly-traded companies. As Wang explained to the jury in his trial testimony, Wang obtained and passed on Inside Information to increase his

chances of getting better pay; although Wang also clarified that his Trellus boss was capricious in how he compensated Wang.[1]

**III. Wang's Cooperation**

As explained more fully below, Wang's cooperation with the Government and the FBI has been substantial. And, throughout the time he has assisted the Government and the FBI, he has been forthright, honest, and accepted responsibility for his past criminal conduct.

The FBI first learned about Wang's involvement in insider trading in approximately 2008, from a cooperating source. The source made consensually recorded telephone calls to/meetings with Wang, during which Wang referenced MNPI. These communications, along with information the source provided to the FBI about Wang, enabled this Office and the FBI to obtain a court order authorizing the interception of telephone calls over Wang's telephones, from about mid-November 2008 until early January 2009. This wiretap yielded incriminating telephone calls between Wang and others (including Doug Whitman), in which MNPI about publicly-traded companies was discussed.

On January 7, 2009, the FBI approached Wang, advised him that he was a subject of an insider trading investigation, and offered him the opportunity to cooperate. Wang briefly spoke with the agents and stated that he wanted to consult with an attorney. Within a week, Wang began cooperating with the FBI. Wang began placing consensually recorded telephone calls to individuals with whom he had exchanged MNPI in the past. And, he agreed to meet with FBI agents and prosecutors concerning his conduct. During these meetings, which began in mid-January

---

[1] We have computed Wang's Guidelines loss amount to be the approximate sum total of his compensation at Trellus and Sigma (between $2.5 and $7 million). This is because Wang did not personally trade on the MNPI he received, Wang did not have trading authorities at Sigma or Trellus, and Wang provided MNPI to his bosses at Sigma and Trellus with the understanding that they were using it to trade securities. [redacted]

2009, Wang admitted that he broke the law by engaging in insider trading, and accepted responsibility for his conduct.

Wang's cooperation has substantially assisted the Government in two principal ways.

*First*, Wang alerted the FBI to approximately 20 individuals whom he believed/suspected were involved in insider trading schemes. Wang helped solidify the proof against a number of these individuals, which enabled the FBI to approach certain of them and utilize them in building substantial criminal insider trading cases. This, in turn, contributed substantially to the criminal convictions of over ten individuals for insider trading related offenses.

*Second*, Wang testified as a cooperating witness at the trial of *United States* v. *Doug Whitman*, 12 Cr. 125 (JSR). Wang testified about certain of his dealings with Whitman, in which he exchanged MNPI on various companies with Whitman – including Cisco, Marvell, and Polycom. Wang's testimony was an important, contributing factor to the jury's conviction of Whitman on all counts.

**1. Wang's Proffers and Proactive Cooperation**

As referenced above, Wang's proactive cooperation included placing consensually recorded telephone calls to several individuals, and recording in-person meetings with certain individuals. Wang began making these recordings in January 2009, shortly after he was approached by the FBI and well before he was offered a cooperation agreement or any disposition of the criminal investigation involving him. The timing of these recordings was crucial. They occurred soon after he was approached, so the targets of those calls had litte reason to suspect that Wang was cooperating. In the case of Doug Whitman, for example, Wang placed recorded telephone calls to him on January 19, 2009 – less than two weeks after first being approached – and Whitman began referring to MNPI during the course of those calls. It should also be emphasized that Wang made recorded, in-person meetings with targets of insider trading investigations, including Karl Motey, among others. While these meetings caused Wang considerable stress, he nonetheless maintained his composure throughout them.

The information Wang provided and yielded through his proactive cooperation resulted in the FBI being able to approach

certain targets, who, in turn, agreed to cooperate. This has yielded tremendous results in insider trading investigations, the most prominent examples of which are summarized below.

Wang's information and cooperation as to Karl Motey, for example, has been important. Based in part on Wang's information regarding Motey's involvement in exchanging MNPI, which was corroborated by a February 2009 consensually recorded meeting Wang had with Motey, the FBI approached Motey in April 2009. After being approached, Motey immediately began cooperating. Over the next year and a half, Motey engaged in more than 400 consensually recorded conversations and meetings at the Government's direction. Motey's cooperation provided the Government with a window into the research matchmaking industry and contributed to the Government's extensive - and fruitful - wiretap investigation into Primary Global Research ("PGR"), its employees, and consultants. Motey's cooperation helped lead to at least ten successful prosecutions of individuals in connection with the matchmaking cases. Motey also testified as a cooperating witness at two trials: (1) in September 2011 at the trial of James Fleischmann in *United States* v. *James Fleischmann*, 11 Cr. 32 (JSR); and (2) in August 2012 at the trial of Doug Whitman in *United States* v. *Doug Whitman*, 12 Cr. 125 (JSR).





In short, and as referenced above, Wang's information and consensually recorded telephone calls and meetings enabled the FBI to pursue various avenues in insider trading investigations, which yielded tremendous success. The importance of Wang's information in this regard cannot be overstated. Wang has not been needed to testify in any of these matters given that the targets elected to cooperate, but would have been available to do so had events unfolded differently. His truthful, candid statements to agents about these individuals in 2009, as well as consensual recorded calls he placed to these individuals and meetings he conducted with them, helped the FBI agents and prosecutors identify them as targets of investigations and approach them in the first instance.

Wang also has identified a number of individuals involved in insider trading whom the FBI has not yet approached and/or whom the Government has not charged. These individuals have been identified as subjects of criminal investigations, which will assist the FBI and the Government in future investigations and charging decisions. Indeed, even today, the fruits of Wang's cooperation are being realized. Given the fluidity of several of these investigations, the Government therefore requests that Wang's continued cooperation be a condition of any term of supervised release and/or probation that the Court may impose, as the FBI and the Government may need Wang's assistance in certain ongoing matters.

It also should be emphasized that Wang advised agents and

prosecutors about the full extent of his involvement in insider trading, which exceeded what the FBI and this Office knew at the time Wang was approached. Wang did not minimize his own involvement, and did not minimize or overstate the involvement of others.[2] Wang also advised FBI agents of his whereabouts and travel plans during the time that he was proactively cooperating. Wang did this notwithstanding the fact that he had not been criminally charged until July 2012 as part of his plea agreement. Wang repeatedly acknowledged - even three years later during his trial preparation - that he had made mistakes in the past, knew he had to tell the truth, and was prepared to accept the consequences for his illegal conduct. Wang was an exemplary witness in this regard.

**2. Testimony at the Trial of Doug Whitman**

Wang also testified in August 2012 as a cooperating witness at the trial of Doug Whitman before Your Honor. Wang has known Whitman since Wang began working for Whitman in 1999, and they remained friends after Wang left Whitman Capital in 2002.

Wang's trial testimony largely was corroborative of the Government's two principal cooperating witnesses, Roomy Khan and Karl Motey. Wang did not, for example, supply the tips that formed the basis of either of the two substantive counts against Whitman, which pertained to Polycom and Google. But, Wang's testimony directly related to Whitman's intent regarding those counts, and was direct evidence of Whitman's guilt as to the conspiracy counts charged in Count 1 and 2 of the Indictment charging Whitman (the "Whitman Indictment") (Count 1 pertaining to Marvell and Count 2 pertaining to Polycom and Google).

Wang prepared extensively with this Office in advance of trial, commencing around May 2012. Although Wang had not resolved the pending investigation against him at that point, Wang immediately began assisting the undersigned prosecutors.

---

[redacted]

Wang did so with no complaints.[3] Wang spent dozens of hours with the undersigned prosecutors reviewing email communications, listening to recorded telephone calls, reviewing instant message communications, and preparing for his testimony. Wang took his trial preparation extremely seriously, and took great pains to be precise and careful in answering questions.

As a general matter, at trial, Wang testified that during the time Wang worked for Sigma and later at Trellus, he continued to be in regular contact with Whitman. Wang and Whitman spoke frequently and discussed with one another what they were hearing from their various contacts. According to Wang, Whitman principally provided Wang with MNPI regarding Polycom, QLogic and Marvell. In exchange, Wang provided Whitman with MNPI that Wang obtained about companies, including Cisco, which was a stock that Whitman traded.

Specifically, for Count 1 of the Whitman Indictment, Wang testified that he had various conversations with Whitman about Marvell, during which Whitman passed MNPI about Marvell to Wang. Based on these conversations, Wang understood that Karl Motey was Whitman's source of MNPI on Marvell. Wang also testified that the information Whitman provided to him from Motey was the most accurate MNPI that Wang received about Marvell, as compared to two other independent inside sources Wang had. Given the frequency with which Whitman and Wang spoke about MNPI on various companies, Wang could not recall specific conversations (such as the dates or places of the conversations) he had with Whitman about Marvell MNPI. Wang told the jury, however, about the general subject matter and tenor of these conversations. Wang explained, for example, that these conversations related to discussions about whether Marvell would meet the expectations for an upcoming quarter, and about the guidance that Marvell would provide for the following quarter. Wang also explained that these communications occurred before the company's announcement for a particular quarter.

---

[3] Wang did so despite dealing with some personal hardships in having to fly across the country on short notice. On one instance, Wang flew from California to New York the weekend before his testimony to meet with prosecutors despite having a very sick dog who had just undergone surgery and who was recovering. At the time Wang was living alone and was very close with his dog, who was Wang's primary companion.

Wang's testimony on this score was corroborated by the testimony of Karl Motey, who explained that he received MNPI about Marvell from two Marvell insiders – William Brennan and Sam Miri – and passed that information on to Whitman. And, Wang's testimony was corroborated by a series of instant message communications between Whitman and Sang Peruri (a buy side analyst at JW Seligmann) in which Whitman referred to Motey's Inside Information, by instant message communications within Whitman Capital in which Whitman and his employee Dave Karson communicated about Motey, and by instant message communications between Wang and Whitman about Marvell.

Wang also testified about other MNPI that Whitman provided to him. Regarding Count 2 of the Whitman Indictment, for example, Wang testified that Whitman provided him with MNPI on Polycom, including directional information regarding how the quarter was going and guidance for upcoming quarters, which Wang, in turn, compared with information he was receiving from Tom Hardin (who worked at a New York hedge fund). Whitman provided Wang with this information before the quarterly announcements, and this lasted until about late 2008. Wang also testified that by late 2008, Whitman explained that his Polycom contact was not calling him back. Wang's testimony on this point was corroborated by the testimony of Roomy Khan, who obtained MNPI on Polycom from Sunil Bhalla (head of Polycom's voice division) starting around 2004 and lasting up until the time that she was approached by the FBI in late 2007. Indeed, Wang's recollection that Whitman advised him around late 2008 that his Polycom contact was not calling him back was consistent with Khan's consensual calls to Whitman, which lapsed around late 2008, and by a December 2008 wiretapped call between Whitman and Wang in which Wang noted that Whitman's Polycom contact had been avoiding Whitman.

It also should be noted that Wang was prepared to testify about additional instances in which Whitman provided Wang with what Wang believed to be MNPI, including on companies such as Q Logic.[4] Ultimately, however, the Government did not seek to introduce all of this evidence because of certain of the Court's *in limine* rulings, which limited the scope of proof the Government could offer at trial against Whitman.

---

[4] This information included Wang's observations of Whitman from as far back as his days as an intern at Whitman Capital, where Wang observed what he believed to be insider trading by Whitman.

Wang also testified at length about the MNPI he provided to Whitman in exchange for the MNPI he received from Whitman. Most prominent in this regard was Wang's information on Cisco, a stock that Whitman traded. Wang's testimony on the scope of his contacts with Whitman again was limited by the Government's decision not to offer all of it, in light of certain *in limine* rulings from the Court.[5]

Thus, Wang's testimony on Cisco consisted of Wang providing Whitman with information Wang obtained from his neighbor, Leo Chocran. Wang met Chocran around late 2004, when Chocran first moved across the street from Wang. Wang testified that he misled Chocran into providing him with MNPI on Cisco. Wang's sister worked at Cisco, and Wang advised Chocran that because of that fact, Wang was not able to trade Cisco stock. Wang assumed that this made Chocran more forthcoming with Wang in discussing specific, inside information about Cisco. According to Wang, the information Chocran provided to Wang about Cisco – which began around late 2005/early 2006 – related to Cisco's earnings, including whether it would meet the quarter, as well as guidance for following quarters. Wang viewed Chocran's information as very accurate, and he passed it on to several people, including Whitman.

Wang's testimony regarding his interactions with Whitman about Cisco was corroborated by wiretapped telephone calls Wang had with Whitman and various instant message communications between Whitman and Wang. In one wiretapped call, for example – a mere two days before Wang was approached by the FBI – Wang spoke with Whitman about his Cisco contact. Whitman asked what Wang was hearing on Cisco, to which Wang responded that he could he "go across the street right now and ask him" about Cisco. This call wholly corroborated Wang's testimony about how he gave Whitman information about Cisco which he obtained from his neighbor Leo Chocran.

In a separate wiretapped call in December 2008, Wang asked Whitman if he traded Google, to which Whitman responded that "Roomy had a mole there for awhile." Wang helped placed this call in context for the jury, by explaining that the term "mole" was used to signify an insider at a company who was providing

[5] Wang was prepared to testify, for example, about how he passed MNPI about Cisco (including gross margin data) to Whitman, from around the time when Wang was at Sigma.

Inside Information. In the ensuing minutes of conversation, Whitman made several incriminating admissions about Cisco and about his understanding of insider trading in general. Among other things, Whitman acknowledged that Whitman had to "assume the guy you talk to from Cisco, who's your buddy, that you give him a bunch of nice wine every once in a while," and that "I would assume you go across the street, something, you'll bring him a nice bottle of wine every once in a while . . . or buy him some dinners, or just something to thank him for the help, right." This call, and Wang's related testimony about providing Inside Information to Whitman about Cisco, was important evidence that the jury considered regarding Whitman's knowledge and intent regarding the counts for which he had been charged, including about how Inside Information was obtained from various sources at issue in the case.

Wang also helped authenticate and place in proper context various instant message communications he had with Whitman, in which Wang made clear to Whitman the sensitive nature of the information he was providing to Whitman. This testimony also was direct evidence of Whitman's intent.

In short, Wang was a credible, truthful witness for the Government. His testimony was corroborated by contemporaneous documents, wiretapped telephone calls, and other witness testimony. Although the defense cross examined Wang at length, the Government submits these efforts did not undermine Wang's credibility, in large part because of Wang's persistence in not minimizing his own culpability and in not overstating the culpability of others. Indeed, the wiretapped telephone calls between Whitman and Wang were entirely consistent with Wang's testimony. On this point, Wang had not listened to these telephone calls until shortly before his testimony in this case, long after he was approached by the FBI and well into his trial preparation.

## IV. Conclusion

Wang's cooperation with the Government has been substantial. Wang identified numerous individuals with whom he had worked and/or associated in the past who were involved in various insider trading activities; this information enabled the FBI and the Government to pursue various investigative techniques, which have proven incredibly effective and which led (indirectly) to the convictions of more than 10 individuals for insider-trading related offenses. Wang also testified as a cooperating witness

at the trial of Doug Whitman over which this Court presided, which resulted in a conviction of Whitman of all counts. And finally, Wang's information, and the fruits of his cooperation, are still being utilized in various insider trading investigations.

The full extent of Wang's information and cooperation remains to be realized. Even taking into account what has been developed to date, it is exceptional. Since Wang's exceptional and timely cooperation has provided substantial assistance to the Government in the investigation and prosecution of numerous individuals, the Government requests that this Court sentence Wang in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines.[6]

Respectfully submitted,

PREET BHARARA
United States Attorney

By: /s/ Christopher L. LaVigne
Christopher L. LaVigne
Jillian B. Berman
Assistant United States Attorneys
Tel.: (212) 637-2325/2197

cc: U.S. Probation Officers Wanda Whitney and Kathleen Coad (via email)
Michael Celio, Esq. (via email)

---

[6] Because this letter contains information regarding Wang's proactive cooperation and makes reference to certain ongoing investigations and uncharged targets, the Government requests that it be filed under seal. The Government will publicly file a redacted version of this letter.